UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| AMY L. BJORK, | ) | CIV. 12-4135-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER REVERSING AND REMANDING |
| CAROLYN W. COLVIN, | ) | DECISION OF COMMISSIONER |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Amy L. Bjork, seeks review of the Commissioner[1] of Social

Security's denial of her claim for disability insurance benefits (SSDI) under

Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental

security income (SSI) under Title XVI of that Act, 42 U.S.C. § 1382. Docket 1,

10. The Commissioner opposes the motion and moves the court to affirm the

denial. Docket 14. For the reasons set forth herein, the court reverses and

remands the Commissioner's decision.

**PROCEDURAL HISTORY**

Bjork applied for SSI and SSDI on October 21, 2008, alleging disability

since May 20, 1993, due to vision problems, depression, and anxiety. AR

---

[1] As permitted by Fed. R. Civ. P. 25(d), Carolyn W. Colvin has been
automatically substituted for Michael J. Astrue. This action survives the
substitution. 42 U.S.C. § 405(g).

143–157, 181, 196.[2] The Social Security Administration (SSA) denied Bjork's

application on initial review and on reconsideration. AR 101–03, 106–09. Bjork

subsequently requested an administrative hearing and appeared unrepresented

before Administrative Law Judge Robert Maxwell (ALJ) on August 13, 2010. AR

43–75, 110–11, 122, 141–42. Thereafter, the ALJ issued an unfavorable

decision finding that Bjork had the residual functional capacity (RFC) to

perform a full range of work at all exertional levels with certain nonexertional

limitations. AR 27–42. Accordingly, the ALJ denied Bjork's claims, concluding

that a significant number of jobs existed that Bjork could perform. AR 41–42.

Bjork timely appealed the ALJ's decision and requested review by the Appeals

Council, but such request was denied on June 15, 2012.[3] AR 104–09. On

July 18, 2012, Bjork commenced this action seeking judicial review of the

Commissioner's denial of her claim for SSI and SSDI. Docket 1.

## FACTUAL BACKGROUND

Bjork was born on November 17, 1961. AR 143. At the time of her

administrative hearing, Bjork was 48 years old. Bjork graduated from Wagner

High School in 1980 and attended secretarial training in 1981. AR 185. Bjork

---

[2] For purposes of this order, all citations to "AR" refer to the administrative record and the relevant page number(s) therein.

[3] Because the Appeals Council denied Bjork's request for review, the ALJ's decision represents the final decision of the Commissioner for purposes of judicial review. 42 U.S.C. § 405(g).

also attended one semester of college. AR 50. Although Bjork did not

participate in special education classes during high school, Bjork's mother

indicated that some of Bjork's high school teachers developed a program for

Bjork "that she could handle."[4] AR 67.

Bjork worked as a cashier at a restaurant from 1989 to 1993 and as a

teacher's aide from 1993 to 1996. AR 219. From 1996 up through the time of

her administrative hearing on August 13, 2010, Bjork worked as a part-time

housekeeper at the Fairfield Inn in Sioux Falls, South Dakota. AR 188.

Although Bjork made minimum wage when she was first hired as a

housekeeper, by 2008 she was earning $7.38 per hour. AR 51, 188. Bjork's

primary responsibilities included cleaning guest rooms, taking out garbage,

and stocking the housekeeping cart. AR 220. At the time of the administrative

hearing, Bjork was working at least 20 hours per week, and sometimes more

depending on the hotel's occupancy. AR 51–53, 188. Bjork testified that

although she could work 40 hours per week if her employer offered her the

opportunity, she was not looking for more work or additional hours. AR 52–53.

In fact, Bjork tried working two jobs at one point but could not handle it. AR

---

[4] In an affidavit dated March 2, 2012, Bjork's mother further testified that,
although Bjork graduated high school, "she received mainly D grades with some
C's and F's mixed in, and she always did poorly on standardized tests." AR 269.
Bjork's educational records confirm this testimony. AR 278–81. Bjork's mother
has also noted that Wagner High School did not offer special education classes
during the relevant time period. AR 67.

54. At the time of her application, Bjork relied, in part, on food stamps and the assistance of her mother for financial support. AR 69, 153.

In her SSI and SSDI applications, Bjork claimed disability based on vision problems, depression, and anxiety. AR 181. Bjork also testified about issues associated with pain in her left knee. AR 56–58. Medical records indicate that Bjork has a history of plantar fasciitis, hypertension, weight problems, anxiety disorder, depression, and tendinitis in the left knee. AR 291–92, 294–95, 297–301, 308–09, 311, 345–46, 348, 363, 367–69, 371, 386–89. Bjork reported taking three prescription medications: Amitriptyline for her depression, Thioridazine for her anxiety, and Accupril for her high blood pressure. AR 62–63, 247, 293, 315, 350, 361.

## I.    Left Knee Pain

Reference to left knee pain first appeared in Bjork's medical record on April 8, 2010, when she was seen for her annual physical exam by Dr. Charles W. Shafer. AR 388. During that appointment, Bjork complained of pain in her left knee, but she added that ibuprofen helped with the pain. Dr. Shafer assessed Bjork with limb pain. Bjork made a similar complaint on June 8, 2010, stating that she noticed the pain after working a double shift, and that the pain occurred when climbing stairs and doing other "quad loading activities." AR 387. Although there was no swelling, no numbness or tingling, and no loss of function, Bjork did report pain with palpatation of the patellar

tendon. Dr. Robin Arends therefore assessed Bjork with tendinitis, administered prednisone, and reviewed stretching and strengthening exercises with Bjork that would help her knee joints. AR 388. On August 2, 2010, Bjork returned to Dr. Shafer with complaints of knee pain, this time reporting that her left knee had buckled one week prior to the appointment. AR 387. Nonetheless, Bjork claimed that the use of a knee support and ibuprofen helped. Dr. Shafer again assessed Bjork with limb pain.

Bjork discussed issues related to left knee pain during the administrative hearing on August 13, 2010, but she noted that the issues had just recently developed. AR 56–57. Bjork stated she wore a knee brace at work and confirmed that she was able to do things like clean the bathroom floor when wearing the brace. AR 58. Bjork also mentioned that taking ibuprofen helped with inflammation in the knee. AR 57–58. Despite these complaints, however, Bjork responded in the negative when asked whether she had any physical conditions that affected her ability to do her job. AR 60–61.

After the administrative hearing, Bjork continued to complain of left knee pain. On September 20, 2010, Bjork reported pain in her left knee, especially when bending down. AR 385. Dr. Shafer again assessed Bjork with limb pain. On December 7, 2010, Bjork reported feeling a small pop in her left knee while working on her knees. AR 384. Bjork stated that although it was a little painful, she could walk without difficulty and continued to work on that

occasion. Dr. Joseph Seurer assessed Bjork with "probabl[e] ligament strain/possible muscle strain." *Id.* Since there was no effusion, Dr. Seurer did not order an x-ray. At her well-woman exam on March 24, 2011, Bjork requested a new support for her left knee, but Dr. Shafer made no additional remarks with regard to Bjork's left knee. AR 382–83. On May 31, 2011, Bjork reported feeling a "bump in her left knee" while climbing a ladder, and she stated she had experienced some pain since that time. AR 381. Dr. Wafa Akkad noted that ibuprofen was not helping "a lot" and assessed Bjork with knee joint pain. Bjork was also assessed with knee joint pain on September 19, 2011 (AR 379) and October 18, 2011 (AR 377). At the appointment on October 18, 2011, Bjork reported her knee buckling twice the day before, but added that she only experienced swelling and no pain. AR 377. Due to the swelling, Dr. Erin Telste ordered an x-ray, but after seeing no abnormalities, Dr. Telste reported no injury to Bjork's knee. Nonetheless, Bjork was referred to the Orthopedic Institute in Sioux Falls, South Dakota, for an evaluation.

On November 12, 2011, Bjork met with Dr. Craig M. Smith at the Orthopedic Institute. AR 24. Dr. Smith found evidence of degenerative joint disease on x-rays of Bjork's left knee and noted "a tight Baker's cyst in the back." *Id.* Dr. Smith also stated that he thought Bjork "simply [had] a flare of her knee arthritis." *Id.* To manage Bjork's knee pain, Dr. Smith recommended an exercise program and a knee sleeve. Dr. Smith also injected Bjork's knee

with corticosteroid. Bjork then met with a physical therapist at Prairie Rehabilitation in Sioux Falls, South Dakota, on November 23, 2011. AR 20–21. The physical therapist noted swelling, some numbness, and a decreased range of motion and strength in Bjork's left knee. The physical therapist prescribed a number of therapeutic exercises.

## II.     Borderline Intellectual Functioning

Bjork asserts that she suffers from borderline intellectual functioning (BIF). Reference to BIF first appeared in Bjork's medical record following Dr. Michael J. McGrath's psychological examination of Bjork on February 9, 2005.[5] AR 284–289. In his psychological report, Dr. McGrath noted that Bjork was somewhat immature and naive, but a sincere individual nonetheless. AR 285. Dr. McGrath attributed these characteristics to Bjork's "apparent marginal intellect," and further stated that Bjork fell in the "lower borderline range." *Id.* Dr. McGrath also noted that Bjork's "[t]hought processes were reasonably logical, albeit somewhat banal;" her "affect was flexible and appropriate;" and although she "initially appear[ed] anxious," she eventually "acclimat[ed] to within normal limits." *Id.* After what appears to have been an extended examination, Dr. McGrath diagnosed Bjork with BIF, but he did not make any observations with regard to how BIF may affect Bjork's daily

_____

[5] This examination was conducted at the request of the state agency in response to a prior disability application.

activities. AR 289. To the contrary, Dr. McGrath noted that Bjork lived in an apartment by herself, prepared meals, read the newspaper, operated an automobile, managed a checking account with some assistance from her mother, and had held the same job for more than eight years. AR 286–88.

Bjork saw Dr. James A. Nardini for a psychological evaluation on January 13, 2009. AR 320–25. Dr. Nardini found that Bjork was a terrible historian, and that it was difficult for Bjork to give a direct answer. AR 320. Dr. Nardini did not believe, however, that Bjork was withholding information from him. AR 324. Rather, it appeared to Dr. Nardini that Bjork operated "on a superficial basis" and "had somewhat of a deficit in regard to intellectual abilities." AR 323–24. "On several occasions [Bjork] would stop, grip her head and indicate that she had to stop and think about the question because 'her brain had gone to sleep.' " *Id.* Dr. Nardini also noted that Bjork was "extremely loud" and "laugh[ed] in situations which [did] not really seem to be humorous." AR 323. But despite the fact that Dr. Nardini found Bjork's thought processes, mental grasp, and capabilities to be "somewhat affected," he believed she had "the ability to maintain appropriate behavior and the ability to adapt to new and different situations as long as those situations [were] not too complex." *Id.* Ultimately, Dr. Nardini concluded that Bjork "probably function[ed] in the borderline classification," but that "it might be helpful to have some further

testing in this regard."[6] AR 324. Similar to Dr. McGrath, Dr. Nardini did not specify how Bjork's borderline classification may affect her daily activities, but instead noted that she appeared capable of independently performing activities of daily living, including cooking, cleaning, shopping, driving, remembering instructions, making simple decisions, maintaining friendships, and holding a job for more than thirteen years. AR 323.

State agency expert, Dr. Doug Soule, conducted a psychiatric review of Bjork's records on February 12, 2009, and although he agreed that medically determinable impairments such as adjustment disorder and BIF were present, he noted that Bjork's impairments were not severe, and that the BIF diagnosis was not supported by testing. AR 326, 330–31. Dr. Soule further concluded that Bjork had no limitations with regard to activities of daily living and social functioning, and that she was only mildly limited with regard to maintaining concentration, persistence, or pace. AR 336. Dr. Stephen Kleinman reviewed Dr. Soule's findings on February 20, 2009, and agreed with the entirety of Dr. Soule's findings. AR 340.

---

[6] Dr. Nardini's diagnosis has created some confusion. Under "diagnostic impression," Dr. Nardini wrote, "[b]orderline intellectual functioning (rule out)." AR 324. The ALJ interpreted this language to mean that Dr. Nardini did not believe Bjork had BIF, but Bjork argues and the Commissioner appears to concede that the language used by Dr. Nardini indicates that he speculated Bjork did, in fact, have BIF. AR 35; Docket 10 at 9; Docket 14 at 17.

Dr. Stephanie Fuller reviewed Bjork's file on March 26, 2009, and affirmed Dr. Soule's assessment. AR 352. Dr. Fuller noted that "[t]he record suggests borderline intellectual functioning." *Id.* Dr. Fuller also stated that, based on a recent mental examination, Bjork "seem[ed] to be functioning fairly adequately, ha[d] numerous friends at work and church, appear[ed] to have the ability to interact with others, [and] appear[ed] to have the[] [a]bility to adapt to new and different situations as long as they [weren't] too complex." *Id.* Dr. Fuller's analysis also made reference to Bjork's long-term job and her ability to live independently. *Id.*

Finally, on April 8, 2009, Dr. Mark Dilger reviewed Bjork's record and performed a mental residual functional capacity assessment. AR 354–60. Dr. Dilger determined that Bjork was moderately limited in eight out of twenty categories of functional capacity.[7] AR 357–58. Based on Dr. Nardini's evaluation and Dr. Fuller's opinion that Bjork had "the ability to adapt to new

---

[7] Dr. Dilger concluded that Bjork was moderately limited, as opposed to not significantly limited or markedly limited, in the following categories: (1) the ability to understand and remember detailed instructions; (2) the ability to carry out detailed instructions; (3) the ability to maintain attention and concentration for extended periods; (4) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) the ability to accept instructions and respond appropriately to criticism from supervisors; (6) the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (7) the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and (8) the ability to respond appropriately to changes in the work setting. AR 357–58.

and different situations as long as they [weren't] too complex," Dr. Dilger concluded that Bjork was "more than non-severe" and thus only capable of performing 1-2 step tasks. AR 355, 359.

The mental impairments listed in Bjork's initial disability report were limited to depression and anxiety. AR 181. In that same report, Bjork stated that her conditions did not cause her to work fewer hours, change her job duties, or make any job-related changes. *Id.* During a subsequent interview with J. Hare on November 10, 2008, Bjork did not appear to have difficulty with reading, understanding, coherency, concentration, talking, or answering questions. AR 198–99. Moreover, in a function report completed on November 22, 2008, Bjork indicated that she had no issues with personal care, was able to manage the preparation of meals and maintenance of her home without assistance, drove a car, and paid her own bills. AR 211–14. Bjork also noted that she was able to follow written and spoken instructions "very well," and that the only work-related task affected by her conditions was her ability to lift more than 25 pounds. AR 215. Bjork did not indicate that her conditions affected intellectual functions such as understanding or concentration. Similarly, during a psychological evaluation on January 20, 2009, Bjork was unable to identify how her alleged disabilities affected her on a daily basis. AR 324. Lastly, during the administrative hearing on August 13, 2010, Bjork responded in the negative when asked whether she had any mental health

problems diagnosed by a doctor or a counselor that she believed affected her ability to work. AR 61. She also testified that she would "probably" be able to work more hours per week and that her health would "probably" allow her to take a housekeeping job that provided more income. AR 52, 56.

Bjork's mother, Norma Jean Jesperson, completed a third-party function report on November 21, 2008, and noted that although Bjork functioned almost entirely independently, she did require reminders to care for her teeth, clean the bathroom, vacuum, and keep her checkbook current. AR 203–04. Jesperson further noted that Bjork was born with her disabling condition.[8] AR 202. Jesperson also believed Bjork had difficulty with talking, concentration, understanding, and following complex instructions. AR 206. Jesperson added that Bjork had difficulty working through situations, required numerous explanations, and need instructions to be written and explained. AR 206, 208. During the administrative hearing, Jesperson testified to details of Bjork's finances, specifically noting that she had access to Bjork's checking account for monitoring purposes, that the cashiers at the bank assisted Bjork in balancing her checkbook, and that she occasionally assisted Bjork with car expenses. AR 68–69. Lastly, Jesperson completed an affidavit on March 2, 2012, in which she iterated Bjork's delayed development, her poor grades in high school, and

---

[8] Jesperson explained this detail during the administrative hearing, stating that Bjork was instrument delivered and developed a high fever at an early age. AR 67.

her struggle with counting change. AR 269–70. Jesperson also noted that Bjork's success at work depended on the kindness and patience of her employer. AR 270.

## ALJ'S DECISION

On August 20, 2010, the ALJ issued a decision denying Bjork's application for SSI and SSDI. AR 27–42. In doing so, the ALJ used a sequential five-step evaluation process.[9] At the first step, the ALJ determined that Bjork had not engaged in substantial gainful activity since December 31, 2000. AR 34. At step two, the ALJ found that Bjork suffered from severe impairments, including anxiety and depression. AR 34. The ALJ further determined, however, that Bjork's vision problems, hypertension, BIF, and knee pain did not qualify as severe impairments. AR 34–35. At step three, the ALJ determined that although Bjork had mild difficulty with social functioning and moderate difficulties with concentration, persistence, or pace, Bjork did not have an impairment or combination of impairments that met or medically equaled a listed impairment. AR 35–37. At step four, the ALJ concluded that Bjork had

---

[9] "The ALJ follows the 'familiar five-step process' to determine whether an individual is disabled." *Martise v. Astrue*, 641 F.3d 909, 921 (8th Cir. 2011) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)). "The ALJ 'consider[s] whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.' " *Id.* (quoting *Halverson*, 600 F.3d at 929); *see also* 20 C.F.R. § 416.920 (detailing the five-step process).

the RFC to perform a full range of work at all exertional levels but with nonexertional limitations. AR 37. More specifically, the ALJ concluded that Bjork was only able to understand, remember, and carry out 1-2 step tasks. AR 41. Based on this RFC determination, the ALJ concluded that Bjork could not perform any past relevant work. *Id.* In the fifth and final step, the ALJ considered the testimony of a vocational expert and determined that Bjork was capable of performing other jobs that existed in significant numbers in the national economy. AR 41–42. Accordingly, the ALJ found that Bjork was not disabled and thus did not qualify for benefits under the Social Security Act.

## STANDARD OF REVIEW

" 'When considering whether the ALJ properly denied social security benefits, we determine whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole.' " *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law," *Id.* (internal citations omitted). Such errors are reviewed de novo. *Id.* (quoting *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

The Commissioner's decision must be supported with substantial evidence in the record as a whole. *Evans v. Shalala*, 21 F.3d 832, 833 (8th Cir. 1994). "Substantial evidence is more than a mere scintilla," *Consol. Edison Co.*

*of New York v. NLRB*, 305 U.S. 197, 229 (1938), but "less than a preponderance," *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006). It is "that which a reasonable mind might accept as adequate to support the Secretary's conclusion." *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996); *see also Burress v. Apfel*, 141 F.3d 875, 878 (8th Cir. 1998). "The 'substantial evidence in the record as a whole' standard is not synonymous with the less rigorous 'substantial evidence' standard." *Burress*, 141 F.3d at 878. " 'Substantial evidence on the record as a whole' . . . requires a more scrutinizing analysis." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (citation omitted).

The court therefore "consider[s] evidence that supports the Secretary's decision along with evidence that detracts from it." *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995) (citation omitted). In doing so, the court may not make its own findings of fact, but must treat the Commissioner's findings that are supported by substantial evidence as conclusive. 42 U.S.C. § 405(g); *see also Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987) (noting that reviewing courts are "governed by the general principle that questions of fact, including the credibility of a claimant's subjective testimony, are primarily for the Secretary to decide, not the courts"). "If, after undertaking this review, [the court] find[s] that 'it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings, [the

15

court] must affirm the decision' of the Secretary.' " *Siemers*, 47 F.3d at 301 (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)). The court may not reverse the Secretary's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984) (citations omitted).

In determining whether the Commissioner's decision is supported by substantial evidence in the record as a whole, the court reviews the entire administrative record and considers six factors: (1) the ALJ's credibility determinations; (2) the claimant's vocational factors; (3) medical evidence from treating and consulting physicians; (4) the claimant's subjective complaints relating to activities and impairments; (5) any third-party corroboration of claimant's impairments; and (6) a vocational expert's testimony based on proper hypothetical questions setting forth the claimant's impairment(s). *Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184–85 (8th Cir. 1989)).

## DISCUSSION

**I.      Whether the ALJ Erred in Failing to Include Knee Pain and Borderline Intellectual Functioning As Severe Impairments at Step Two of the Sequential Analysis.**

The ALJ found that substantial evidence supported the conclusion that Bjork's depression and anxiety constituted severe impairments. On the other hand, the ALJ found that Bjork's vision problems and hypertension, each of

which was controlled by medication, did "not impose more than minimal limitations on Bjork's ability to perform basic work-related activities and therefore [did] not constitute . . . 'severe' impairment[s]." AR 34. The ALJ also found that the record was "void of a diagnosis related to knee pain," which supported the conclusion that Bjork's knee pain was "not a medically determinable impairment." AR 35. Finally, the ALJ found that there was no evidence to support a finding that Bjork's intellectual functioning constituted a severe impairment. *Id.* To the contrary, the ALJ concluded that Bjork failed to allege any problems associated with intellectual functioning, "demonstrated the ability to live independently for the most part," and "maintain[ed] employment for an extended period of time without any problems associated with any intellectual limitations." *Id.*

Bjork contends that the ALJ erred at step two by failing to identify Bjork's left knee impairment and intellectual functioning impairment as severe. Docket 10 at 16–25. At step two, a claimant must establish whether she has a medically determinable physical or mental impairment that is severe. 20 C.F.R. § 416.920(a)(4)(ii); *see also Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) ("It is the claimant's burden to establish that [her] impairment or combination of impairments are severe.") (citation omitted). A severe impairment must "significantly" limit the claimant's physical or mental ability to do basic work activities, 20 C.F.R. § 416.920(c), such as walking, standing, sitting, lifting,

pushing, pulling, reaching, carrying, handling, understanding, remembering simple instructions, using judgment, responding appropriately to usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. §§ 416.921(b)(1)-(6). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 404.1521(b).

A. **The ALJ's determination that Bjork's knee pain did not constitute a severe impairment is supported by substantial evidence in the record as a whole, but the ALJ erred in concluding, without fully developing the record, that Bjork's knee pain did not constitute a medically determinable impairment.**

Bjork asserts that the ALJ erred in failing to identify her knee pain as a severe impairment, or at the very least should have found that her knee pain was a medically determinable impairment. Docket 10 at 22–25. A severe impairment is one that "significantly" limits the claimant's ability to do basic work activities. 20 C.F.R. § 416.920(c). A medically determinable impairment is one that results "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527.

At the time of the administrative hearing, the only compelling evidence in the record of Bjork's left knee pain included her subjective complaints. In analyzing "a claimant's subjective complaints of pain, an ALJ is required to examine: (1) the claimant's daily activities; (2) the duration, frequency and intensity of pain; (3) dosage, effectiveness, and side effects of medication;

18

(4) precipitating and aggravating factors; and (5) functional restrictions." *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996). Bjork conceded during the administrative hearing that she was able to perform her daily activities despite her physical condition (AR 58, 60–61); Bjork stated that the onset of knee pain was recent (AR 57); Bjork noted that taking ibuprofen helped address her knee issues (AR 57–58); Bjork confirmed she could perform work-related activities while wearing a knee brace (AR 58); and Bjork's medical records showed no functional restrictions due to issues associated with Bjork's left knee pain. Based on Bjork's testimony during the administrative hearing, it is clear that Bjork's knee pain did not significantly limit her ability to perform basic work activities. The ALJ's determination regarding the severity of Bjork's knee pain is thus supported by substantial evidence in the record as a whole.[10]

Nonetheless, a review of the new evidence, which was provided to and considered by the Appeals Council,[11] reveals that Bjork's knee pain constituted

---

[10] On January 20, 2009, Dr. Gregory Erickson analyzed Bjork's records and concluded that, because Bjork only reported physical limitations which were either adequately controlled with treatment or not supported by medical evidence, Bjork's impairments were non-severe. AR 319. This assessment was affirmed by Dr. Frederick Entwistle on March 27, 2009. AR 353.

[11] Bjork provided the Appeals Council with additional medical records from Falls Community Health, which document a series of appointments regarding left knee pain beginning in April 2010 and continuing through 2011. AR 377–92. In its decision denying Bjork's request for review of the ALJ's determination, the Appeals Council noted that it had considered the new evidence Bjork submitted in relation to appointments at Falls Community Health. AR 5. Because the Appeals Council considered this new evidence, the court "include[s] such

a medically determinable impairment. If the ALJ had fully developed the record, he would have discovered the appointment on June 8, 2010, during which Dr. Arends assessed Bjork with tendinitis[12] and noted that Bjork's "[k]nees showed abnormalities." AR 387–88. Because this information was available to the ALJ yet never obtained for consideration,[13] and because a failure to consider this evidence prejudiced Bjork,[14] the court finds that the ALJ failed to fully develop the record. *See Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983) ("It is the administrative law judge's duty to develop the record fully and fairly.") (citation omitted). The ALJ's failure to develop the record more fully is reversible error. *See Cox v. Apfel*, 160 F.3d 1203, 1210 (8th Cir. 1998) (finding reversible error where an ALJ failed to obtain all relevant medical records prior to making its disability determination).

---

evidence in the substantial evidence equation." *Mackey v. Shalala*, 47 F.3d 951, 953 (8th Cir. 1995). The court, however, will not include evidence the Appeals Council did not consider. Accordingly, the medical evidence from the Orthopedic Institute (AR 24–25) and from Prairie Rehabilitation (AR 20–21) are not considered evidence in the substantial evidence equation.

[12] Tendinitis is the "[i]nflammation of a tendon." *Stedman's Medical Dictionary* 1944 (28th ed. 2006).

[13] The ALJ was aware that Bjork had seen Dr. Shafer with complaints of knee pain in the months preceding the administrative hearing. AR 56–57. The ALJ was also aware that, at the time of the administrative hearing, his office had not yet received all the up-to-date records from Falls Community Health. AR 46.

[14] Bjork was eventually assessed an RFC with no exertional limitations. AR 37–41.

**B. The ALJ's determination that Bjork's level of intellectual functioning did not constitute a severe impairment is not supported by substantial evidence in the record as a whole.**

Bjork contends that based on information from her various psychological examinations and reviews, the ALJ should have identified BIF as one of Bjork's severe impairments, or at the very least should have further investigated Bjork's intellectual functioning because each of the examining and non-examining medical experts noted evidence of BIF in their reports. Docket 10 at 17–22; AR 289, 324, 330, 338, 352, 359. A review of the record confirms the repeated identification of BIF by medical experts. On February 14, 2005, Dr. McGrath examined Bjork and concluded that she fell "in the lower borderline range." AR 285. As a result, Dr. McGrath diagnosed Bjork with BIF.[15] AR 289. On January 20, 2009, Dr. Nardini conducted a psychological evaluation of Bjork and observed the same. AR 324. Dr. Nardini indicated such finding by noting that Bjork "probably functions in the borderline classification" and subsequently diagnosed Bjork with BIF.[16] Id.

Dr. Nardini's finding was affirmed by Dr. Soule on February 12, 2009, who further concluded that Bjork's impairments were not severe. AR 326, 330. Dr. Fuller conducted a case analysis on March 26, 2009. He found no evidence of change and affirmed Dr. Soule's assessment. AR 352. Additionally, Dr. Fuller noted that Bjork's record suggested BIF. *Id.* Finally, on April 8, 2009, Dr. Dilger

---

[15] Dr. McGrath did not indicate whether Bjork's impairment was severe.

[16] Dr. Nardini did not indicate whether Bjork's impairment was severe.

reiterated previous findings of BIF, but added that Dr. Fuller's conclusion that

Bjork had "the ability to adapt to new and different situations as long as they

[weren't] too complex, coupled with Dr. Nardini's evaluation, indicated "that the

claimant [was] more than non-severe." AR 359.

In concluding that Bjork's BIF did not constitute a severe impairment,

the ALJ considered only the evaluations of Drs. McGrath and Nardini.[17] AR 35.

Beginning with Dr. McGrath's evaluation, the ALJ determined that the

diagnosis of BIF was not supported by appropriate testing. *Id.* Furthermore, the

ALJ noted that Bjork had failed to allege any problems associated with BIF and

instead "demonstrated the ability to live independently for the most part." *Id.*

The ALJ then made brief reference to Dr. Nardini's report, and noted that

"Dr. Nardini ruled out borderline intellectual functioning." As a result, the ALJ

concluded that the evidence did not support the finding of a severe impairment.

*Id.*

The ALJ's interpretation of Dr. Nardini's evaluation, however, is

erroneous. Dr. Nardini did not rule out BIF, but instead made explicit reference

to his belief that Bjork "probably functions in the borderline classification." AR

324. Dr. Nardini also diagnosed Bjork with BIF, writing "[b]orderline

intellectual functioning (rule out)" under "diagnostic impression." *Id.*

Dr. Nardini's use of the words "rule out" does not indicate that he ruled out

---

[17] The ALJ did not provide an explanation as to why he disregarded the
observations of the non-examining experts.

BIF. Had Dr. Nardini ruled out BIF, he would not have stated within his diagnostic impression his conclusion that Bjork probably functions in the borderline classification. The use of the words "rule out" indicate that Dr. Nardini believed further evaluation was necessary before he could rule out BIF. Nonetheless, the ALJ did not order further evaluation, nor did he discredit the additional evaluations, which were conducted by Drs. Soule, Fuller, and Dilger. Each of the additional evaluations noted evidence of BIF and offered contradictory conclusions regarding the severity of such impairment.

The Commissioner asserts that the diagnosis of BIF was not supported by sufficient medical evidence, and therefore was properly considered a non-severe impairment. Docket 14 at 17. In actuality, however, all the medical evaluations support the diagnosis, and there is no medical evidence to the contrary. The Eighth Circuit has held that "[a] diagnosis of borderline intellectual functioning should be considered severe when the diagnosis is supported by sufficient medical evidence." *Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007) (citing *Hunt v. Massanari*, 250 F.3d 622, 625–26 (8th Cir. 2001)). Because the record clearly establishes a diagnosis of BIF, and because the ALJ based his decision on an erroneous interpretation of Dr. Nardini's psychological evaluation, the court finds the ALJ's determination that Bjork's

level of intellectual functioning did not constitute a severe impairment is not supported by substantial evidence in the record as a whole.[18]

In light of the court's findings with regard to step two of the sequential analysis, it is unnecessary to reach Bjork's arguments with respect to stage five of the sequential analysis. Accordingly, it is

ORDERED that the Commissioner's decision denying Bjork's claim for disability insurance benefits is reversed, and this matter is remanded to the Commissioner for further proceedings consistent with this opinion. On remand, psychological testing should be ordered to determine the extent of Bjork's intellectual functioning.

Dated September 30, 2013.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

---

[18] Alternatively, the Commissioner asserts that even if the ALJ found BIF to constitute a severe impairment, such error was harmless because the ALJ later accounted for Bjork's intellectual limitations by assigning an RFC that limited Bjork to performing 1-2 step tasks. Docket 14 at 18. To support her assertion, the Commissioner cites *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001), a case wherein the Eighth Circuit held that a functional limitation of "doing simple work adequately account[ed] for the finding of borderline intellectual functioning." But the Commissioner's reliance on *Howard* is misplaced. The issue in *Howard* was not whether the diagnosis of BIF constituted a severe impairment, but whether the hypothetical question posed to the vocational expert adequately accounted for the limitations associated with BIF. The court therefore rejects the Commissioner's argument that the ALJ's error was harmless.